IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| **TERRY D. GILLILAND,** | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) CIVIL ACTION NO.: |
| **NORTH AMERICAN ON-SITE STAFFING,** | )<br>)<br>)<br>) |
| Defendant. | ) **JURY TRIAL DEMANDED**<br>)<br>) |

## VERIFIED COMPLAINT

**COMES NOW** the Plaintiff, Terry D. Gilliland, by and through his attorneys of record, and pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, files this Complaint against Defendant, North American On-Site Staffing, and states as follows:

## NATURE OF THE CASE

1. This is a lawsuit brought by the Plaintiff, Terry D. Gilliland, who has been affected by the interference and retaliation set forth below, seeking permanent relief from unlawful retaliatory practices involving leave, termination, and other terms and conditions of employment caused by the failure of Defendant, North American On-Site Staffing ("Defendant" or "North American"), to provide appropriate leave and remedy systemic retaliation based on association with people with disabilities. The actions of Defendant alleged herein violate the Family and Medical Leave Act of 1993, as amended, 29 USC § 2601, et seq. ("FMLA"), on the basis of both interference and retaliation.

1

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331 and 1343, and 29 USC § 2601.

3. Plaintiff has fulfilled all conditions precedent to the institution of this action.

4. Plaintiff is a resident of the state of Alabama, and of this judicial district and division. The Defendant is located and/or conducting business within this judicial district and division. This action is brought within the judicial district wherein the unlawful employment practices were committed, making venue proper under 28 U.S.C. § 1391(b).

## PARTIES

5. Plaintiff, Terry D. Gilliland (hereinafter, "Mr. Gilliland" or "Plaintiff"), is an adult resident of the state of Alabama. Plaintiff was employed by the Defendant at all times material herein.

6. Defendant, North American On-Site Staffing (hereinafter, "North American" or "Defendant"), was the employer of the Plaintiff. Further, at all times material herein, Defendant was the employer of the Plaintiff within the meaning of the Family and Medical Leave Act.

## STATEMENT OF FACTS

7. Plaintiff is a 50-year old male who began working for North American in 2013 as Senior Staffing Supervisor.

8. When Plaintiff was hired, his salary was $33,500, his benefits included health, dental, and vision insurance, and a 401(k)-retirement plan.

9. During that period, Plaintiff's branch manager was Carla Underwood.

10. Plaintiff worked in that position for three years until April 2016, when the company had a lay-off.

11. Plaintiff was rehired on July 13, 2017 as a Staffing Supervisor.

12. Carla Underwood was Branch Manager prior to Donna Swafford, Ed Burr was Vice President of Operations, and Donna Swafford was Branch Manager.

13. Upon being rehired, Plaintiff received the same salary, $33,500, and the same benefits.

14. Plaintiff never received any performance evaluations during his employment with Defendant.

15. Carla Underwood left North American in or around February 2018.

16. Plaintiff's wife, Amanda Gilliland, began having heart problems in March 2018, which were causing her to have episodes at work in which she would black out.

17. During one of those episodes, Amanda was sent to the CareHere Clinic at Mercedes, where she works, then to the Druid City Hospital (DCH) emergency room, where she saw a cardiologist, Dr. Kimberly Skelding, who diagnosed her with a mitral valve leakage and inserted a catheter in her wrist and a heart monitor loop in her chest.

18. After Amanda's diagnosis, Dr. Skelding advised Amanda that she should not be alone or driving due to the risks associated with her blackouts.

19. On or about April 1, 2018, Amanda had another episode at work during which she did not black out, but felt dizzy. She informed her supervisor that she felt uncomfortable driving herself home from work, but Mercedes would not allow a co-worker to drive her home unless she "took vacation time."

20. Plaintiff informed Ed Burr about Amanda's condition and his need to take off from work that day in order to drive her home. Burr responded, "okay, keep me in the loop."

21. Dr. Skelding had referred Amanda to a neurologist in Tuscaloosa, Dr. Pressley, to determine why she was passing out, but she was unable to see Dr. Pressley due to financial pressures.

22. Plaintiff took leave from work approximately four to six times to take care of Amanda while she was experiencing blackouts.

23. In or around April 2018, Donna Swafford was hired out of Georgia to replace Carla Underwood as Branch Manager.

24. A few days after Swafford arrived, Plaintiff asked Ed Burr why he wasn't considered for the Branch Manager position, as he believed himself to be more than qualified for the position.

25. Plaintiff was already performing many of the functions of Branch Manager, such as conducting interviews, talking to clients, and securing sales for the company.

26. Burr replied that the Branch Manager position was 95 percent sales, and Plaintiff was mainly a recruiter.

27. Plaintiff did have sales experience, however, and he had recently secured two major corporate clients for the company: Borgers and Team Solutions.

28. Three weeks after Swafford arrived, Plaintiff had a meeting with her about his responsibilities at North American.

29. In that meeting, Swafford praised Plaintiff for his ability to get his work done without being micromanaged in comparison to other employees, particularly Kris McCutcheon, who kept coming to Swafford asking for assignments.

30. McCutcheon made $37,500 compared to the $33,500 Plaintiff made.

31. When Plaintiff made Swafford aware of his salary, she replied, "Are you kidding me? No one with your skillset should be making less than $35,000."

32. Swafford requested a salary raise for Plaintiff; Ed Burr denied it.[1]

33. On or around April 16, 2018, Plaintiff provided Ed Burr with numerous doctors' notes and a schedule of appointments for when Plaintiff would need to be out of work to take care of Amanda.

34. Plaintiff took three days off in April 2018 to take care of Amanda, but he went in to work each night from 5 p.m. to 2 a.m. to get payroll done for various suppliers for whom North American provided services. During that time, Plaintiff's son stayed with Amanda while he was at work.

35. On July 21, 2018, Plaintiff was supposed to be at work at 8:00 a.m. for a job fair at Mercedes.

36. While Plaintiff had his alarm set on his cell phone, his phone battery died, and he inadvertently overslept until 11:20 a.m.

37. As soon as he woke up, he called Ed Burr and also sent text messages to Burr and Swafford to let them know he was on his way.

38. Burr and Swafford both responded to him with messages to the effect of "don't bother."

---

[1] Whether the tone at North American is set by Mr. Burr, the company demonstrates a gross pattern of discrimination and retaliation against its employees. Examples include North American recruiters, including Plaintiff, being told by Ed Burr and Melissa Bryant not to recruit anyone for hire over the age of 45, and to avoid women. If an applicant was sent to Mercedes for recruitment, they were required to pass an assessment test before being hired. There were many times that applicants passed the assessment test, but Plaintiff and other recruiters had to tell applicants that they did not pass because they were either too old, overweight, or pregnant. Plaintiff **never** saw an overweight person or a woman he believed might possibly be pregnant hired at Mercedes during his time as a recruiter for North American. When Melissa Bryant wanted males for a certain job, she would call Plaintiff or another recruiter at North American and ask specifically for "heavy lifters," with the implication that she only wanted men recruited. Further, Ed Burr and Susan Morris even went so far as to refer to white applicants as "ones" and black applicants as "twos" when they believed there were too many black workers on the job. Mercedes, in particular, boasts about its ratio of 70% white and 30% black population; thus, there were many instances when Plaintiff was informed by Ed Burr and Susan Morris that they needed "more ones" and/or there were "too many twos." In fact, Burr told Plaintiff, Steven Bell, and other recruiters to circle "1" or "2" on the applicant's form after interviewing them, and those forms were subsequently used as part of the hiring process. Finally, if someone was hurt on the job at Metalsa (a Mercedes supplier), Ed Burr would give them "light duty" in the office at North American for a short period of time, but when they felt better, Burr would have Plaintiff or another recruiter tell the person who was injured that their position was no longer open, there were no other positions available, which was completely false, and release them from the company. When Plaintiff confronted Burr about this, Burr replied, "they ain't gonna do nothing but get hurt again over there."

5

39. Cody Adrian, another recruiter, texted Plaintiff and told him that the situation was not a big deal, as there were not many people at the job fair, and they had started sending people home early.

40. At 11:20 a.m., Adrian said that he, Burr, and Swafford were the only people left.

41. Kris McCutcheon, on-site manager, also called in sick, throwing up, and Swafford told him not to bother coming in.

42. Plaintiff has had high blood pressure for several years, for which he has to take prescription medication.

43. On Tuesday, July 31, 2018, Plaintiff checked his blood pressure at Rite Aid, and it was 138/96; he took a picture of the reading, went back to work and showed the picture to Swafford, who told him to take some aspirin.

44. On Wednesday, August 1, 2018, Plaintiff returned to work with a blood pressure reading of 155/102; at that point, Swafford told him to go to the emergency room.

45. Plaintiff went to the emergency room at DCH where he was admitted for an EKG and heart x-rays under the care of cardiologist Dr. Jeffrey Anderson.

46. On the same day (August 1, 2018), Plaintiff was transported to DCH Regional for a heart catheterization, and had two stints put in his heart.

47. There was 80% blockage in his aorta and 70% blockage in another artery, as well as substantial build-up in other arteries, which had to be cleaned out.

48. These procedures caused Plaintiff to miss work from Wednesday, August 1-Friday, August 3, 2018.

49. Plaintiff subsequently followed up with his general practitioner, Dr. Larry Skelton, who kept him out of work an additional week through August 10, 2018.

50. While Plaintiff was in the hospital recovering from his surgical procedure, he was still receiving emails from Swafford and McCutcheon claiming they did not know how to do things, despite the fact that they knew he was in the hospital. Those emails caused Plaintiff's blood pressure to continue to elevate until a nurse finally ordered him to discontinue contact with them.

51. Plaintiff returned to work on Monday, August 13, 2018, with limitations from his doctor not to lift more than five pounds and to "take it easy."

52. Plaintiff informed Swafford when he returned on Monday that he had a follow-up appointment with Dr. Anderson on Friday, August 17, 2018, at 10:30 a.m., that he would come to work first, then go to the appointment, then return to work after the appointment. He followed that conversation up with an email on August 13, 2018.

53. Plaintiff asked Swafford about FMLA forms and how to fill them out on August 13, 2018 when he returned to work.

54. Swafford replied, "Well, I don't know that much about it. You need to contact Candise in Georgia."

55. Plaintiff assumed she was referring to Candise Durnwald, Defendant's Human Resources Manager, so he sent an email to Ms. Durnwald on August 13, 2018 asking for the proper FMLA paperwork.

56. Plaintiff never received any response from Ms. Durnwald regarding his FMLA request.

57. Plaintiff knew that Defendant did not keep FMLA forms available in its office because he was aware of all of the human resources forms on site from his previous dealings with employees as a recruiter; thus, he could not fill them out without assistance from Ms. Durnwald or someone else in the company's human resources office in Georgia.

58. On Monday, August 13, 2018, Plaintiff stayed at work until 5:30 p.m. to finish payroll and staffing for Metalsa.

59. On Tuesday, August 14, 2018, Plaintiff worked a regular eight-hour day, working with Metalsa.

60. On Wednesday, August 15, 2018, Plaintiff went into work at 7:30 a.m. Around 3 p.m., he was called into Swafford's office, where Wanda Elliot, receptionist/recruiter, was present. The following exchange occurred:

**Swafford**: "Terry, I've got to have a witness in here. Today is your last day."

**Plaintiff**: "What?"

**Swafford**: "Ed is hung up on you not being here that Saturday [July 21, 2018]."

**Plaintiff**: "That was three weeks ago."

> Swafford discussed a severance package, then stated: "You can sign it or not sign it. Take the severance package and have an attorney look over it."

**Plaintiff**: "I'm being terminated because of my health?"

**Swafford**: "If you feel that way, then you need to do what's best for you and your family."

**Plaintiff**: "I will."

**Swafford**: "If you file for unemployment, we're not gonna fight it, but you won't receive unemployment until the severance is paid."

> She then told him not to send the signed severance agreement to her, but to the corporate office in Duluth, Georgia.

**Swafford**: "Do you need any help getting your things?"

**Plaintiff**: "No, I've got everything."

> Plaintiff then turned in his keys, but while he was gone to Metalsa, they changed the locks.

61. Swafford's claim that Defendant would not fight Plaintiff's unemployment claim, however, proved to be either erroneous or untruthful.

62. When Plaintiff filed for unemployment compensation after his termination, Defendant disputed his claim, and the State Examiner imposed a disqualification and denied benefits under the provisions of Section 25-4-78(3)(b) of the Unemployment Compensation Law based upon a finding that Plaintiff was discharged from North American for misconduct committed in connection with work repeated after previous warning.

63. Plaintiff appealed that determination. It was reversed because the evidence demonstrated that despite being aware of Plaintiff's absence at the time it happened (July 21, 2018), Defendant waited until August 15, 2018 to terminate his employment as a result of that incident. Thus, so much time had passed between the occurrence of the terminating offense and the date of Plaintiff's termination, that there was no longer a direct, causal relationship between the offense and Defendant's decision to terminate him.

64. Plaintiff still has not been paid for the work he completed on August 13, 14, and 15 of 2018, as his last paycheck was given to him at the end of August, and those dates were not included.

65. Plaintiff has called and spoken with both Wanda Elliot and Kris McCutcheon about not receiving his final paycheck. He was told that he needed to talk to Swafford, and that "Donna is checking in on it."

66. To this day, Plaintiff has not received a call back from Swafford or anyone else at North American regarding his missing pay for the work he completed on August 13, 14, and 15 of 2018.

67. Further, Plaintiff was not issued a company phone for recruiting purposes like other similarly situated employees were, such as Kailey Loomis.

68. Ed Burr specifically stated to Plaintiff, "I'm not getting you a company phone."

## COUNT ONE
## FAMILY AND MEDICAL LEAVE ACT OF 1993:
## INTERFERENCE

69. Plaintiff adopts and re-alleges each and every allegation contained in this Complaint as if set out anew herein.

70. Plaintiff was denied full benefits and rights under the FMLA, in that Defendant interfered with the exercise of rights to which he was entitled under the FMLA.

71. Plaintiff informed Defendant's agent, Donna Swafford, that he would be taking emergency leave for his surgical procedure, and when he returned from his emergency leave, he needed FMLA forms to fill out. Swafford directed Plaintiff to Candise Durnwald, Human Resources Manager, because she did not know the process for filling out FMLA forms.

72. When Plaintiff informed Defendant of his surgical procedure and specifically requested FMLA forms from human resources, Defendant did not inform Plaintiff of his rights under the FMLA or process his request; rather, Defendant's agent, Candise Durnwald, blatantly ignored Plaintiff's request.

73. Defendant's actions were in violation of the FMLA, and were taken willfully and with malice or reckless indifference to Plaintiff's federally-protected rights.

74. As a result of Defendant's intentional interference with Plaintiff's rights under the FMLA, Plaintiff has suffered and will continue to suffer damage to his professional life and career opportunities, pecuniary losses, emotional distress, inconvenience, humiliation, shame, mental anguish, loss of enjoyment of life, and non-pecuniary damages.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff requests the following relief:

a. Reinstatement; or, in the alternative,

b. Front pay;

c. Back pay;

d. Injunctive relief;

e. Attorneys' fees;

f. Costs;

g. Liquidated Damages to deter such action in the future; and

h. Such other legal or equitable relief as may be appropriate to effectuate the purposes of the FMLA or to which Plaintiff may be reasonably entitled.

## COUNT TWO
## FAMILY AND MEDICAL LEAVE ACT OF 1993:
## RETALIATION

48. Plaintiff adopts and re-alleges each and every allegation contained in this Complaint as if set out anew herein.

49. Plaintiff was denied full benefits and rights under the FMLA, in that he was retaliated against based on his attempted exercise of rights to which he was entitled under the FMLA.

50. Plaintiff engaged in the statutorily-protected activity of applying for FMLA leave. He asked Swafford for FMLA paperwork on August 13, 2018. She directed him to Defendant's HR Manager, Candise Durnwald. He emailed Durnwald that same day, August 13, 2018, requesting FMLA paperwork. Durnwald never responded. On August 15, 2018, two days after twice asking for FMLA paperwork, Plaintiff was terminated by Swafford. Plaintiff suffered adverse employment decisions when Defendant, upon Plaintiff's return to work, ignored

Plaintiff's requests for FMLA leave, refused to pay him for his final three days of work, and ultimately terminated him.

51. Defendant's actions were in violation of the FMLA, and were taken willfully and with malice or reckless indifference to Plaintiff's federally-protected rights.

52. As a result of Defendant's retaliation against Plaintiff for attempting to exercise his rights under the FMLA, which resulted in, among other things, the denial of FMLA leave, denial of pay, and his ultimate termination, Plaintiff has suffered and will continue to suffer damage to his professional life and career opportunities, pecuniary losses, emotional distress, inconvenience, humiliation, shame, mental anguish, loss of enjoyment of life, and non-pecuniary damages.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff requests the following relief:

a. Reinstatement; or, in the alternative,

b. Front pay;

c. Back pay;

d. Injunctive relief;

e. Attorneys' fees;

f. Costs;

g. Liquidated Damages to deter such conduct in the future; and

h. Such other legal or equitable relief as may be appropriate to effectuate the purposes of the FMLA or to which Plaintiff may be reasonably entitled.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON ALL CLAIMS SO TRIABLE.**

## VERIFICATION

STATE OF ALABAMA )
COUNTY OF LAMAR )

I, **TERRY D. GILLILAND,** having been duly sworn, depose and state that I have read the foregoing **Verified Complaint**, and that the information stated therein as factual is true, and those factual matters which are stated upon information and belief are believed to be true.

_____
PLAINTIFF TERRY D. GILLILAND

STATE OF ALABAMA )
COUNTY OF LAMAR )

Personally appeared before me, Edith R. Herndon, a Notary Public in and for said county and state, **Terry D. Gilliland**, who after being first duly sworn, affirms that he has read and understands the Verified Complaint herein and that same is true and correct to the best of his knowledge, information, and belief.

**SWORN TO and SUBSCRIBED before me on this the 14th day of August, 2020.**

[Seal]

_____
NOTARY PUBLIC
My Commission Expires: October, 26, 2020

My Commission Expires
October 26, 2020

Respectfully submitted,

/s/  Karli B. Guyther
John D. Saxon
Alabama Bar No. ASB-3258-071J
Karli B. Guyther
Alabama Bar No. ASB-1278-Z82E
*Attorneys for Plaintiff*

OF COUNSEL:

JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203
Tel:    (205) 324-0223
Fax:   (205) 323-1853
Email:  jsaxon@saxonattorneys.com
           kguyther@saxonattorneys.com


PLAINTIFF'S ADDRESS

TERRY D. GILLILAND
c/o JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203

PLEASE SERVE DEFENDANT BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED AT:

NORTH AMERICAN ON-SITE STAFFING
c/o Corporate Creations Network, Inc.
Registered Agent
2985 Gordy Parkway
First Floor
Marietta, GA 30066